UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

DMT S.A.,

        Plaintiff,

        v.                                 Case No. 07-C-656

ENERCON INDUSTRIES CORPORATION,

        Defendant.

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE
12(b)(6) OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
AND DISMISSING CASE

        The plaintiff, DMT S.A. (DMT), a French corporation, entered into an agreement with the defendant, Enercon Industries Corporation (Enercon), a Wisconsin company, for the manufacture of two corona treating stations for use by DMT's customers in China. The defendant completed the stations, referred to as the LI-229 project and the WF-222 project, and delivered them to the plaintiff. The plaintiff sent the LI-229 equipment to its customer in China and the WF-222 equipment to a customer in Iran. Both stations failed.

        DMT brought two separate lawsuits: one based on failure of the LI-229 project, Case No. 06-C-1191, and the instant case based on failure of the WF-222 project. In this case, DMT alleges breach of contract (Count I), breach of express warranty (Count II), breach of implied warranty of merchantability (Count III), breach of implied warranty of fitness for a particular purpose (Count IV), fraud in the inducement (Count V), quantum meruit/unjust enrichment (Count VI), and promissory estoppel (Count VII). Now, Enercon moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or in the alternative for summary

judgment arguing that it has no obligation to DMT because DMT's delivery of the WF-222 project to Iran violates U.S. export laws.[1]

STANDARD OF REVIEW

"Under Rule 12(b), when matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Berthold Types Ltd. v. Adobe Sys. Inc.* 242 F.3d 772, 775 (7th Cir. 2001). *See also Marques v. Fed. Reserve Bank of Chi.,* 286 F.3d 1014, 1017 (7th Cir. 2002) ("A motion under Rule 12(b)(6) becomes a motion for summary judgment when the defendant attaches materials outside the complaint . . . and the court actually considers some or all of those materials."). Here, Enercon moved to dismiss pursuant to 12(b)(6) and seeks conversion of that motion into one for summary judgment. (Def.'s Br. in Supp. 5.) DMT's response brief demonstrates its understanding of Enercon's motion and recognizes that the motion may be considered as one for summary judgment. (Pl.'s Resp. 3.) Indeed, DMT repeats the summary judgment standard and attaches a supporting affidavit to its response brief. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d

---

[1] As noted, two cases based on the same transaction between the parties are pending before this court. This case is a spin-off from the first, Case No. 06-C-1191, and was filed in response to Enercon's counterclaim in the earlier case seeking a declaration that it owed no obligation to DMT on the WF-222 project. On August 27, 2007, Enercon filed identical motions in both cases: the instant Motion to Dismiss Pursuant to Rule 12(b)(6) or in the Alternative Motion for Summary Judgment, and a Motion for Summary Judgment on its Counterclaim in Case No. 06-C-1191. Enercon's motions in both cases allege the same point: It has no obligation regarding the WF-222 project because DMT's transfer of the project to Iran violated U.S. export laws.

The parties have submitted briefs and supporting materials applicable to both cases. For example, Enercon filed one "Brief in Support of its Motion for Summary Judgment (Case No. 06-C-1191) and in Support of its Motion to Pursuant to Fed. R. Civ. P. 12(b)(6) or in the Alternative for Summary Judgment (Case. No. 07-C-656)," along with one set of Proposed Findings of Fact. The brief in support is docketed as #83 in 06-C-1191 and #5 in 07-C-656, and the proposed findings of fact document is docketed as #84 in 06-C-1191 and #6 in 07-C-656. DMT filed one "Response to Defendant's Motion to Dismiss" in Case No. 07-C-656, and no response to Enercon's proposed findings of fact.

2

Case 2:07-cv-00656-CNC   Filed 04/24/08   Page 2 of 10   Document 16

469, 479 (7th Cir. 2002) ("This requirement of a reasonable opportunity to respond is mandatory, not discretionary."). Therefore, because parties have had the opportunity to brief the matter and to supply supporting materials, Enercon's motion will be addressed as one for summary judgment.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier

3

of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

BACKGROUND[2]

DMT is a French corporation with its principal place of business in France. (Compl. ¶ 4.) It is an engineering and consulting company specializing in sectors of raw materials exploration, product testing, building safety, construction, infrastructure, measuring technology, power supplies and electrode assemblies. (Compl. ¶ 3.) Enercon, a Wisconsin corporation with its principle place of business in Menomonee Falls, Wisconsin manufacturers and delivers power supplies and electrode assemblies. (Compl. ¶¶ 5-6.)

On August 5, 2003, DMT and Enercon entered a contract (hereinafter "contract" or "agreement") whereby DMT agreed to purchase from Enercon certain corona treatment equipment. A corona treater is used by paper, plastic, foil and film converters to increase the surface tension of materials to make them easier to print on or to laminate other products. In corona treating, packaging materials are passed through an electrical discharge known as a "corona," which is essentially an ionized air gap created between a high-voltage, high frequency charged electrode and a metal roll across which a film passes.

The agreement between the parties covered three corona treatment projects, including the one at issue, the WF-222 project. (Compl. Ex. A.) China was listed as the location for the WF-222 project on the August 5, 2003, summary of the agreement ("Agreement Summary"). (*Id.*) The Agreement Summary provided that "the equipment is

---

[2] Enercon submitted Proposed Findings of Fact in support of its Motion for Summary Judgment on its Counterclaim (Doc. #6). DMT refused to respond to Enercon's Proposed Findings of Fact pursuant to Civil L. R. 56.2(b)(1), though it attached an affidavit of Hans Werner Hartman to its brief in opposition to plaintiff's motion. As such, to the extent that Enercon's proposed facts comply with Civil L.R. 56.2, they are considered undisputed.

warranted for 12 months after start-up." (*Id.*)  The associated purchase order for the WF-222 project further provided a warranty for "12 months in material and workmanship from the date of start-up, maximum 24 months from the date of delivery." (Compl. Ex. B.)

DMT accepted delivery of the WF-222 order on August 29, 2003, in Menomonee Falls, Wisconsin.  (Decl. Morgan ¶ 10.)  In October 2003, Enercon learned, contrary to the indications on the Agreement Summary and other documents, that DMT had shipped WF-222 equipment to Iran rather than to China.  (*Id.* ¶ 11.)   Enercon advised the U.S. Department of the Treasury on October 22, 2003, that DMT had, without Enercon's prior knowledge or consent, shipped the WF-222 equipment to Iran.  (*Id.* ¶ 12.)  Enercon then advised DMT by letter on October 29, 2003, and by email on October 30, 2003, that shipment of the WF-222 equipment to Iran was in violation of U.S. Export Controls and that Enercon would provide no spare parts, technical assistance, or support for any of the WF-222 equipment.  (*Id.* ¶ 13.)

On February 2, 2004, Enercon's outside counsel was faxed an Administrative Subpoena from the U.S. Department of Commerce relating to DMT's shipment of the WF-222 equipment to Iran.  (*Id.* ¶ 14).  As a result of continuing communications during 2004 between Enercon and the Treasury, Enercon was instructed not to transact any further direct business with DMT.  (*Id.* ¶ 15).  On December 22, 2004 Enercon's President, Greg Schuelke, notified DMT that Enercon would no longer do any direct business with DMT. (*Id.*)

On August 17, 2007, DMT brought suit against Enercon asserting seven causes of action based on breach of contract, quasi-contract, and tort theories related to the performance of the WF-222 project.  Enercon now moves to dismiss pursuant to Rule 12(b)(6).

DISCUSSION

Enercon's argument in support of its motion to dismiss is straightforward: DMT violated United States law by diverting the WF-222 equipment to Iran, and further performance of the contract would be unlawful. Thus, according to Enercon, the contract is illegal and void.

The parties agree that Wisconsin law governs interpretation of the contract. Under Wisconsin law, a contract "is illegal where its making or performance is expressly forbidden by statute or its making or performance is made a crime or where a penalty is imposed for doing the act agreed upon." *Kryl v. Frank Holton & Co.*, 259 N.W. 828, 829 (1935) (citing Restatement, *Contracts*, § 580).

Initiated pursuant to Presidential Executive Orders, "the Iranian trade embargo was intended 'to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States presented by the actions and policies of the Government of Iran.'" *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1206 (9th Cir. 2003) (*citing* Exec. Order No. 12959 (1995)); *see also* Exec. Order No. 13059 (1997), 62 Fed. Reg. 44531. These Orders "have largely been codified in the Iranian Transactions Regulations," *id.*, *see* 31 C.F.R. Part 560, *et seq.*, and strictly limit "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran." 31 C.F.R. § 560.204. This includes

> the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that: (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the

> Government of Iran; or (b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

*Id.* The Fourth Circuit has recognized the broad nature of these export restrictions:

> The President issued [Executive Order 12959] "to deal with Iran's unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 12959. The order is clothed with the most serious of purposes, and it is couched in the broadest of terms. It prohibits, with only limited exceptions, the exportation "of *any* goods, technology . . . or services," the reexportation "of *any* goods or technology," the entering into "*any* transaction . . . by a United States person relating to goods or services of Iranian origin," and "*any* new investment by a United States person in Iran." *Id.* (emphasis added). Moreover, it bars "*any* transaction . . . that evades or avoids" its restrictions. *Id.* (emphasis added). The obvious purpose of the order is to isolate Iran from trade with the United States.

*U.S. v. Ehsan*, 163 F.3d 855, 859 (4th Cir. 1998). *See also Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005) (discussing the intent of Executive Orders 12959 and 13059).

Here, it is undisputed that DMT shipped the WF-222 equipment to Iran contrary to the agreement of Enercon and DMT, which provided that the equipment was intended for China. DMT makes no excuse for this action and does not contend that the WF-222 equipment is no longer in Iran or was not destined for Iran. Instead, it argues that once DMT took title of the equipment in the United States, the transaction was completed and no illegality as to the contract exists. "What DMT, a French company and not subject to U.S. laws, decides to do with the Corona Stations subsequent to the title transfer is DMT's concern." (Pl.'s Resp. to Def.'s Mot. to Dismiss 5.)

DMT's assertion, however, misses the mark in an action based in part on Enercon's failure to remedy alleged defects in the equipment *after* it ended up in Iran. DMT fails to allege how, once Enercon discovered that the WF-222 equipment was shipped to Iran, Enercon's continued performance of the contract—fulfilling the alleged warranty by providing replacement parts and service for the WF-222 equipment in Iran—is consistent with U.S. export law. Notably, DMT provides no authority for its position, a position that appears to go against the intent and plain language of 31 C.F.R. § 560.204 prohibiting any United States person or entity from exporting *directly or indirectly* any goods or services to Iran. Had Enercon acted to "cure material defects" in the WF-222 equipment, as demanded by DMT, no cause of action would likely arise. And because such action by Enercon would have violated United States law, failure of Enercon to provide spare parts, technical assistance or support for the WF-222 equipment would be unenforceable as those actions would be illegal.[3] *See Snyder v. Badgerland Mobile Homes*, Inc., 260 Wis. 2d 770, 782, 659 N.W.2d 887, 893 (Ct. App. 2003) ("The controlling analysis in determining whether a statutory or regulatory

---

[3] While not raised by the parties, the court notes that whether Wisconsin law or federal law governs the enforceability of the contract may be an open question as Enercon raises a federal law claim as a defense. The Seventh Circuit has stated "When the statute is federal, federal law determines not only whether the statute was violated but also, if so, and assuming the statute itself is silent on the matter, the effect of the violation on the enforceability of the contract." *N. Ind. Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 273 (7th Cir. 1986) (*citing Walsh v. Schlecht*, 429 U.S. 401, 407-08 (1977)). *See also Kelly v. Kosuga*, 358 U.S. 516, 519 (1959) ("Obviously, state law governs in general the rights and duties of sellers and purchasers of goods, . . . while the effect of illegality under a federal statute is a matter of federal law . . . even in diversity actions in the federal courts . . . ."); *Bassidji*, 413 F.3d at 936 (discussing whether enforceability of a contract interpreted under California law, but arguably illegal under Executive Order 13059 (Iran sanctions), is governed by federal law). In this case, the effect of illegality on the contract would not, under these circumstances, turn on the application of federal or Wisconsin law. Enforcement of the agreement between the parties on DMT's asserted theories would contradict the strong language of Executive Order 13059 and 31 C.F.R. § 560 et seq., barring transactions by U.S. entities involving, directly or indirectly, including via reexportation through a third country, goods, technologies, or services to Iran. Thus, in this case, DMT's ability to collect damages on U.S. goods it intentionally and without modification reexported to Iran in violation of U.S. law would contradict public policy.

8

violation renders a contract unenforceable is the intent underlying the provision that was violated."); 6 Samuel Williston & Richard Lord, *A Treatise on Contracts* § 12:4 (4th ed.) (noting that pursuant to Restatement (Second), a court must balance factors in considering the impact of illegality on contract enforceabiltiy, and that "a promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."). That DMT is a French corporation and took title to the equipment in the United States does not alter the outcome as the applicable law prohibits even the indirect exportation of any goods or services to Iran. At the moment DMT shipped the project to Iran, the execution of Enercon's agreement with DMT became illegal. *See generally Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (discussing court enforcement of illegal bargains). Further, adopting DMT's position on Counts I, II, III, or IV, would violate the intent of sanctions designed to isolate Iran from trade with United States entities. *See* 31 C.F.R. § 506.206 ("(a) [N]o United States person, wherever located, may engage in any transaction or dealing in or related to . . . (2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran. . . . (b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing."); § 506.208 ("[N]o United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.").

DMT maintains that even if its contract with Enercon is invalid, it should not be prevented from recovering under one of its equitable theories. (Pl.'s Br. in Opp. to Def.'s Mot. to Dismiss 5.) However, it points to no authority supporting its claim that an invalid or illegal contract may still give rise to quasi-contractual recovery. *Cf. Hiltpold v. T-Shirts Plus, Inc.*, 98 Wis. 2d 711, 717, 298 N.W.2d 217, 220 (Ct. App.1980) (noting that in the event a contract is void for illegality, "courts will leave the parties where they find them."). It further provides no argument as to which of its theories should survive a finding that the agreement is illegal and unenforceable under the circumstances. As the cause of action in this case arises out of the defendant's alleged failure to perform on a contract which became illegal due solely to the actions of the plaintiff, equitable remedies are not appropriate, and indeed, permitting DMT to recover would be against public policy. *See Ehsan*, 163 F.3d at 859 (4th Cir. 1998) (discussing the intent for trade restrictions against Iran).

Now, therefore

IT IS ORDERED that the defendant's Motion to Dismiss Pursuant to 12(b)(6) or in the Alternative for Summary Judgment (Doc. # 4) is granted and this case is dismissed.

Dated at Milwaukee, Wisconsin, this 24th day of April, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE

10